APPEAL NO. 22-13513-AA

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

MATTHEW SCHRIER,

APPELLANT,

v.

QATAR ISLAMIC BANK,

APPELLEE.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN
DISTRICT OF FLORIDA, FORT LAUDERDALE DIVISION, NO. 20-CV-60075-RKA

APPELLANT MATTHEW SCHRIER'S OPENING BRIEF

John H. Rains IV
rains@bmelaw.com
Kamal Ghali
ghali@bmelaw.com
Matthew R. Sellers
sellers@bmelaw.com
**Bondurant, Mixson & Elmore, LLP**
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309
Tel: 404-881-4100
Fax: 404-881-4111

*Attorneys for Appellant Matthew Schrier*

Appeal No. 22-13513-AA
*Schrier v. Qatar Islamic Bank*

# CERTIFICATE OF INTERESTED PERSONS
# AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, 26.1-2, and 26.1-3, the following is an alphabetical list of the trial judges, attorneys, persons, firms, partnerships, and corporations that are known to have an actual or potential interest in the outcome of this appeal:

1. Altman, Roy K. (United States District Judge – Southern District of Florida)

2. Baker, Emma (FOIA Counsel for Appellant)

3. Bondurant, Mixson & Elmore, LLP (Trial and Appellate Counsel Law Firm for Appellant)

4. Carroll, Kevin T. (Trial Counsel for Appellant)

5. Castello, Leslie M. (Counsel for Appellee)

6. Couriel, John D. (Former Trial Counsel for Appellant)

7. Crowell & Moring LLP (Trial & Appellate Counsel Law Firm for Appellee)

8. Ederi, Ariella J. (Counsel for Appellee)

9. Ghali, Kamal (Counsel for Appellant)

10. Guiffre, T. Michael (Counsel for Appellee)

11. Hulsey, G. Scott (Former Trial Counsel for Appellant)

12.         Hughes, Hubbard & Reed LLP (FOIA Counsel for Appellant)

13.         Kaplan, Aryeh Lev (Counsel for Appellee)

14.         Kobre & Kim, LLP (Trial Counsel Law Firm for Appellant)

15.         Lapointe, Markenzy (Counsel for Appellee)

16.         Layman, Shawn (Counsel for Appellee)

17.         McMullen, Patrick (Former Non-Litigation Counsel for Appellant)

18.         Pillsbury Winthrop Shaw Pittman LLP (Trial and Appellate Counsel

            Law Firm for Appellee)

19.         Qatar Islamic Bank (Appellee)

20.         Rains IV, John H. (Counsel for Appellant)

21.         Salinas, Alexander A. (Former Trial Counsel for Appellee)

22.         Schrier, Matthew (Plaintiff-Appellant)

23.         Sellers, Matthew R. (Counsel for Appellant)

24.         Sparacino PLLC (Non-Litigation Counsel for Appellant)

25.         Sparacino, Ryan R. (Non-Litigation Counsel for Appellant)

26.         Squire Patton Boggs, LLP (Former Trial Counsel Law Firm for

            Appellant)

27.         Tendler, Carrie A. (Trial Counsel for Appellant)

28.         Thompson, Donald L. (Former Trial Counsel for Appellee)

29.         Weiss, Jonathan R. (Former Trial Counsel for Appellee)

30.　　　Wiggin & Dana, LLP (Former Trial Counsel Law Firm for Appellant)

Matthew Schrier is an individual and thus does not have any parent corporations or publicly held or traded corporations to disclose.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Matthew Schrier requests oral argument. This case presents complicated issues of service and personal jurisdiction, and it will require the application of relatively new Supreme Court precedent in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021). Moreover, so far as Schrier is aware, this case will be the first time this Court has construed personal jurisdiction in context of the Anti-Terrorism Act, an important federal statute that gives a cause of action to American victims of terrorism. This Court should grant oral argument to parse the legal issues and reverse the district court's dismissal of the case for lack of personal jurisdiction.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT .................................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES ..................................................................... iv

JURISDICTIONAL STATEMENT ........................................................ xi

STATEMENT OF THE ISSUES ..................................................................... 1

STATEMENT OF THE CASE ........................................................................ 2

    I.   Schrier's Kidnapping, Captivity, and Torture ................................ 3

    II.  QIB's Support of Terrorism ........................................................ 5

    III. These Proceedings .................................................................... 9

SUMMARY OF THE ARGUMENT ..................................................... 11

ARGUMENT AND CITATIONS OF AUTHORITY ......................................... 14

    I.   Schrier effected service on QIB in the United States and in Qatar ............ 15

        A. Schrier properly served QIB's Patriot Act agent in New York
           under the ATA .................................................................. 15

        B. Schrier undisputedly served QIB in Doha, Qatar under Rule 4(f)........ 20

    II.  The ATA and Rule 4(k)(2) confer a statutory basis for personal
        jurisdiction consistent with due process under the Fifth Amendment ....... 20

ii

A. The ATA's nationwide service provisions provides a statutory basis for personal jurisdiction .......................................................... 21

B. Rule 4(k)(2) provides an additional statutory basis for personal jurisdiction............................................................................... 22

C. The exercise of jurisdiction under either the ATA or Rule 4(k)(2) comports with Fifth Amendment due process ...................................... 24

    i.    QIB used its U.S. correspondent accounts to process six transactions that financed the Syrian terrorist groups that harmed Schrier................................................................... 25

    ii.   QIB conspired with the terrorists that kidnapped, tortured, and held Schrier............................................................... 32

    iii.  QIB's conduct caused effects in the United States sufficient for personal jurisdiction............................................................. 39

D. The exercise of jurisdiction under Rule 4(k)(2) will not offend traditional notions of fair play and substantial justice ......................... 44

III. Jurisdiction is also proper because it would be neither arbitrary nor fundamentally unfair under the Fifth Amendment..................................... 45

IV. The Florida Long-Arm Statute provides an alternative basis for personal jurisdiction that comports with due process ............................... 47

V. The district court failed to exercise its discretion in the face of QIB's discovery misconduct ....................................................... 50

CONCLUSION .................................................................... 52

CERTIFICATE OF COMPLIANCE.................................................... 54

CERTIFICATE OF SERVICE ....................................................... 55

# TABLE OF AUTHORITIES

**Page**

<u>CASES</u>

*Al Rushaid v. Pictet & Cie*,
    68 N.E.3d 1 (N.Y. 2016) ............................................................. 25

*Atchley v. AstraZeneca UK Ltd.*,
    22 F.4th 204 (D.C. Cir. 2022) ................................................. 24, 26

*AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*,
    608 F.Supp.2d 1349 (S.D. Fla. 2009) ......................................... 48

*Baxter v. Palmigiano*,
    425 U.S. 308 (1976) ................................................................. 27, 30

*Boim v. Holy Land Found.*,
    549 F.3d 685 (7th Cir. 2008) .................................................. 29, 43

*Bouzo v. Citibank, N.A.*,
    96 F.3d 51 (2d Cir. 1996) ............................................................ 27

*Bristol-Myers Squibb Co. v. Super. Ct.*,
    137 S. Ct. 1773 (2017) ................................................................. 46

*Burger v. Hartley*,
    896 F. Supp. 2d 1157 (S.D. Fla. 212) ......................................... 37

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985) ......................................................... 29, 42, 52

*Caiazzo v. Am. Royal Arts Corp.*,
    73 So.2d 245 (Fla. 4th DCA 2011) ............................................. 49

*Calder v. Jones*,
    465 U.S. 783 (1984) ..................................................................... 39

*Charles Schwab v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018) ...................................................................... 33, 36

*Citicorp. Ins. Brokers (Marine), Ltd. v . Charman*,
635 So.2d 79 (Fla. 1st DCA 1994) .............................................................. 49

*Consolidated Dev. Corp. v. Sherritt, Inc.*,
216 F.3d 1286 (11th Cir. 2000) ...................................................... 23, 33, 35

*D.J. Simmons, Inc. v. Broaddus*,
No. 99-1105, 2000 WL 36729814 (D.N.M. June 10, 2000) ...................... 52

*Daimler AG v. Bauman*,
571 U.S. 117 (2014).................................................................................... 34

*Del Valle v. Trivago GmbH*,
No. 20-12407, 2022 WL 17101160 (11th Cir. Nov. 22, 2022).......... 3, 11, 14

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
46 F.4th 226 (5th Cir. 2022) (en banc) ................................................. 45, 46

*eLandia Int'l, Inc. v. Ah Koy*,
690 F.Supp.2d 1317 (S.D. Fla. 2010)..................................................... 33, 48

*Envases Venezolanos, S.A. v. Collazo*,
559 So.2d 651 (Fla. 3d DCA 1990).............................................................. 48

*Experience Hendrix, LLC v. Chalpin*,
461 F. Supp. 2d 165 (S.D.N.Y. 2006) .......................................................... 27

*Ford Motor Co. v. Montana Eighth Judicial District Court*,
141 S. Ct. 1017 (2021)........................................................................... *passim*

*Fraser v. Smith*,
594 F.3d 842 (11th Cir. 2010) ..................................................................... 22

*Gill v. Arab Bank, PLC*,
893 F. Supp. 2d 474 (E.D.N.Y. 2012)........................................................... 43

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ............................................................... 36, 38

*Hamilton Grp. Funding, Inc. v. Basel*,
    311 F. Supp. 3d 1307 (S.D. Fla. 2018) ...................................................... 27

*Henderson v. Cherry, Bekaert, & Holland*,
    932 F.2d 1410 (11th Cir. 1991) .................................................................. 18

*Herederos de Roberto Gomez Cabrera, LLC v. Teck Resources Ltd.*,
    43 F.4th 1303 (11th Cir. 2022) ....................................................... 13, 24, 46

*Holder v. Humanitarian Law Project*,
    561 U.S. 1, 34–35 (2010) ............................................................................ 44

*In re Terrorist Attacks on Sept. 11, 2001*,
    718 F. Supp. 2d 456 (S.D.N.Y. 2010) ........................................................ 42

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
    456 U.S. 694 (1982) .................................................................................... 52

*Intercapital Funding Corp. v. Gisclair*,
    683 S.2d 530 (Fla. 4th DCA 1996) ............................................................. 49

*ISI Int'l, Inc. v. Borden Ladner Gervais, LLP*,
    256 F.3d 548 (7th Cir. 2001) ...................................................................... 23

*Koch v. Royal Wine Merchants, Ltd.*,
    907 F. Supp. 2d 1332 (S.D. Fla. 2012) ...................................................... 35

*Kyko Global, Inc. v. Prithvi Info. Sols. Ltd.*,
    No. 2:18-cv-1290, 2020 WL 3654951 (W.D. Pa. July 6, 2020) ................. 33

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ............................................................ 28, 31, 32

*Licciardello v. Lovelady*,
    544 F.3d 1280 (11th Cir. 2008) ........................................................... 38, 48

*Louis Vuitton Malletier, S.A. v. Mosseri*,
    736 F.3d 1339 (11th Cir. 2013) .................................................. 24, 26, 31, 44

*LSLJ P'ship v. Frito-Lay, Inc.*,
    920 F.2d 476 (7th Cir. 1990) ...................................................... 51

*Madara v. Hall*,
    916 F.2d 1510 (11th Cir. 1990) ........................................... 14, 15

*Malautea v. Suzuki Motor Co.*,
    987 F.2d 1536 (11th Cir. 1993) ................................................. 50

*Managed Care Adv. Grp., LLC v. CIGNA Healthcare, Inc.*,
    939 F.3d 1145 (11th Cir. 2019) ........................................... 45, 46

*Mitnor Corp. v. Club Condos.*,
    339 F.R.D. 312 (N.D. Fla. 2021) ................................................. 51

*Morris v. Khadr*,
    415 F. Supp. 2d 1323 (D. Utah 2006) ...................................... 39, 40, 41, 42

*Mwani v. bin Laden*,
    417 F.3d 1 (D.C. Cir. 2005) ................................................ *passim*

*Nelson v. Swift*,
    271 F.2d 504 (D.C. Cir. 1959) ................................................... 18

*Oldfield v. Pueblo de Bahia Loria, S.A.*,
    558 F.3d 1210 (11th Cir. 2009) ....................................... 12, 21, 23

*Posner v. Essex Ins. Co., Ltd.*,
    178 F.3d 1209 (11th Cir. 1999) ....................................... 14, 27, 37

*Ramos-Barrientos v. Bland*,
    661 F.3d 587 (11th Cir. 2011) ................................................... 19

*Republic of Panama v. BCCI Holdings (Luxembourg), S.A.*,
    119 F.3d 935 (11th Cir. 1997) ............................................ *passim*

*Rudersdal v. Harris*,
    No. 1:18-cv-11072, 2022 WL 263568 (S.D.N.Y. Jan. 28, 2022) ............... 33

*Sargeant v. Hall*,
    951 F3d 1280 (11th Cir. 2020) ................................................................. 17

*Schansman v. Sberbank of Russia PJSC*,
    565 F. Supp. 3d 405 (S.D.N.Y. 2021) ........................................................ 43

*SEC v. Carrillo*,
    115 F.3d 1540 (11th Cir. 1997) ................................................................. 25

*SEC v. Levine*,
    279 F. App'x 6 (D.C. Cir. 2008) ............................................................... 27

*SEC v. Marin*,
    982 F.3d 1341 (11th Cir. 2020) ................................................................. 21

*Showan v. Pressdee*,
    922 F.3d 1211 (11th Cir. 2019) ................................................................. 51

*Stansell v. FARC*,
    771 F.3d 713 (11th Cir. 2014) ................................................................... 36

*United States v. Bradley*,
    644 F.3d 1213 (11th Cir. 2011) ................................................................. 35

*United States v. Hale*,
    422 U.S. 171 (1975 ................................................................................... 31

*United States v. Irey*,
    612 F.3d 1160 (11th Cir. 2010) (en banc) ................................................ 21

*United States v. Parker*,
    376 F. App'x 1 (11th Cir. 2010) ................................................... 27, 30, 31

*United States v. Smith*,
    918 F.2d 1551 (11th Cir. 1990) ................................................................. 35

*United States v. Yousef*,
    327 F.3d 56 (2d Cir. 2003) ................................................... 13, 45

*United States v. Wilchcombe*,
    838 F.3d 1179 (11th Cir. 2016) .............................. 27, 30, 31

*Utd. Techs. Corp. v. Mazer*,
    556 F.3d 1260 (11th Cir. 2009) ................................................. 34

*Walden v. Fiore*,
    517 U.S. 277 (2014).................................................................... 34

*Weinstock v. Abu Marzook*,
    No. 17-23202, 2019 WL 1470245 (S.D. Fla. April 3, 2019) ...................... 22

*Weiss v. Nat'l Westminster Bank, PLC*,
    176 F. Supp. 3d 264 (E.D.N.Y. 2016)...................................... 26, 27, 28, 43

*Wells Fargo Equip. Fin., Inc. v. Bacjet, LLC*,
    221 So.3d 671 (Fla. 4th DCA 2017).......................................... 50

*Wultz v. Islamic Republic of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010)........................................ 39, 40, 42

## STATUTES

8 U.S.C. § 1189 ............................................................................ 4

18 U.S.C. § 2333 .................................................................... xi, 2

18 U.S.C. § 2334(a) ................................................ 11, 15, 16, 21

28 U.S.C. § 1291 .......................................................................... xii

28 U.S.C. § 1331 .......................................................................... xii

28 U.S.C. § 1367 .......................................................................... xii

28 U.S.C. § 1608(b)(2)............................................................... 16

31 U.S.C. § 5318(k)(3)(A), (B) .......................................................... 9, 15

42 U.S.C. § 9613(e) ........................................................................... 16

Fla. Stat. § 48.193(1)(a)(2) ......................................................... 13, 47

## RULES

Fed. R. Civ. P. 4(c)(1) ....................................................................... 36

Fed. R. Civ. P. 4(f)(2)(C)(ii) ............................................................ 10

Fed. R. Civ. P. 4(f)(3) ........................................................... 10, 12, 20

Fed. R. Civ. P. 4(h)(1)(B) ................................................................. 16

Fed. R. Civ. P. 4(k)(2) ................................................................ *passim*

Fed. R. Civ. P. 12(h) ......................................................................... 20

Fed. R. Civ. P. 30(d)(2) ..................................................................... 50

## CONSTITUTIONAL PROVISIONS

Fifth Amendment ........................................................................ *passim*

Fourteenth Amendment ......................................................... 1, 22, 45

## OTHER AUTHORITIES

Executive Order 13224, *Blocking Property and Prohibiting
    Transactions with Persons Who Commit, Threaten to Commit,
    or Support Terrorism* (Sept. 23, 2001) ............................................ 4

*Black's Law* Dictionary (11th ed. 2019) ................................................ 16

*Justice Against Sponsors of Terrorism Act of 2016* (JASTA),
Pub. L. 114-222 § 2(b), 130 Stat. 852, 853 .......................................... 17

## JURISDICTIONAL STATEMENT

Schrier asserts claims under a federal statute, the Anti-Terrorism Act, 18 U.S.C. § 2333.  The district court had federal question jurisdiction to hear those claims under 28 U.S.C. § 1331.  The district court had supplemental jurisdiction over Schrier's state-law claims under 28 U.S.C. § 1367.  The district court dismissed Schrier's claims for lack of personal jurisdiction on September 30, 2022.  Schrier disputes the district court's ruling on personal jurisdiction and so timely appealed that final order on October 19, 2022.  This Court has jurisdiction to review the district court's final order under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The issues for decision are:

1.     Whether Schrier properly served QIB in New York under the Anti-Terrorism Act ("ATA") nationwide service provision;

2.     Whether the district court erred in declining to exercise personal jurisdiction under the ATA or Federal Rule of Civil Procedure 4(k)(2), and whether such jurisdiction comports with Fifth Amendment due process;

3.     Whether Fifth Amendment due process requires minimum contacts for personal jurisdiction;

4.     Whether, in the alternative, the district court erred in declining to exercise personal jurisdiction under the Florida Long-Arm Statute, and whether such jurisdiction would comport with Fourteenth Amendment due process; and

5.     Whether the district court abused its discretion in failing to address QIB's discovery misconduct.

1

## STATEMENT OF THE CASE

The Nusra Front, a Syrian terrorist organization, kidnapped and tortured Matthew Schrier for seven months, all as part of its goal of sowing pain and terror in the United States and extracting a ransom from the U.S. government. For six weeks of those seven months, it handed Schrier over to its ally Ahrar al-Sham for continued captivity. During Schrier's captivity, both groups had support from foreign donors, charities, and financial institutions, including QIB. QIB lent its services to agents and supporters of the Nusra Front and Ahrar al-Sham. QIB knew its services were used to support these groups—it had due diligence policies specifically to make it aware when its services financed terrorism. Yet it allowed Syrian terrorist groups to fundraise using its services for nearly a year after Schrier fortunately escaped. Schrier brought suit under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, to obtain relief from the bank that supported his captors.

The district court erroneously dismissed for lack of personal jurisdiction. QIB is subject to personal jurisdiction in U.S. federal court for three reasons. It maintains correspondent accounts in New York that it used to process transactions for the terrorists that injured Schrier; it conspired with those same terrorists; and its support of terrorism caused effects in the United States that suffice for jurisdiction. This Court should reverse.

On review of a motion to dismiss for lack of personal jurisdiction, this Court "accept[s] the factual allegations in the complaint as true to the extent they are uncontroverted and construe[s] all reasonable inferences in the plaintiffs' favor." *Del Valle v. Trivago GmbH*, No. 20-12407, 2022 WL 17101160, at *2 (11th Cir. Nov. 22, 2022). The brief cites Schrier's Second Amended Complaint where QIB offered no contrary evidence, and it cites evidence adduced in jurisdictional discovery where appropriate.

## I.    Schrier's Kidnapping, Captivity, and Torture.

Schrier traveled to Syria in late 2012 to document the Syrian Civil War as a photojournalist. Doc. 149 ¶¶ 37–38 (Second Am. Compl.). On what he thought would be his last day there, December 31, 2012, he tried to take a taxi from Aleppo to the Turkish border. *Id.* ¶ 39. On the way, three men in a Jeep blocked Schrier's taxi, forced him out, and put him in the back of the Jeep with a rifle flush against his temple. *Id.* ¶ 40. The men took him to the basement of a former children's hospital where Schrier discovered the Nusra Front had kidnapped him and that the basement would serve as his prison. *Id.* ¶ 41.

The Nusra Front was al-Qaeda's Syrian arm. *Id.* ¶ 32. It sought to replace Syrian dictator Bashar al-Assad's regime with an Islamic state. *Id.* ¶ 33. It used terrorism, assassination, hostage taking, and suicide bombings to advance its political goals. *Id.* ¶ 34. It targeted Americans for kidnapping to cause pain and sow

terror in the U.S. *Id.* ¶ 72. On December 11, 2012, the State Department designated it a foreign terrorist organization under 8 U.S.C. § 1189 and Executive Order 13224, *Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism* (Sept. 23, 2001). *Id.* ¶ 36.

The Nusra Front held Schrier for nearly seven months in deplorable conditions without adequate ventilation, electricity, sanitation, or heat. *Id.* ¶ 49. They denied him access to a bathroom for days at a time, and he only rarely had a shower. *Id.* ¶ 52. Unable to wash, his skin became severely infected. *Id.* ¶ 53. His clothes and bedding were infested with bedbugs, and he had no means of exterminating them. *Id.* ¶ 54.

The Nusra Front also tortured him. *Id.* ¶ 56. The first session came after he made a failed escape attempt; his captors forced a tire over his bent knees and shoved a rod between his knees and the tire to prevent him from moving. *Id.* ¶ 57. They then flipped Schrier over and beat the bottoms of his feet over a hundred times with a black cable. *Id.* The beating left him unable to walk for a time. *Id.*

Twice, the Nusra Front tortured him to extract a false confession that he was an undercover CIA agent. *Id.* ¶ 58. The first time, Schrier resisted. *Id.* ¶ 59. The second time, Schrier resisted but, when he realized the Front's torturers would not stop till he told them what they wanted to hear, he falsely confessed. *Id.* ¶ 60. The Front made a video of his false confession that it told Schrier it intended to use to

4

induce the Qatari government to negotiate with the United States. *Id.* ¶¶ 61–62. The Qatari government negotiated tens of millions of dollars' worth of ransom payments in exchange for the release of European hostages in the Middle East. *Id.* ¶ 63. The clear inference is that the Front intended to force the U.S. government's hand to secure Schrier's release, by paying a ransom or otherwise. *Id.* ¶ 66.

For a month and a half, the Nusra Front handed Schrier over to its ally, Ahrar al-Sham, for continued captivity and torture. *Id.* ¶ 45. Ahrar al-Sham fought with the Nusra Front and shared resources, and the groups shared the goal of replacing the Assad regime with an Islamist state. *Id.* ¶ 46. The conditions of captivity were no better. He again lacked adequate ventilation, electricity, sanitation, or heat. *Id.* ¶ 49. And Ahrar al-Sham continued the torture. *Id.* ¶ 56.

After months of captivity, and at least ten torture sessions, *id.*, Schrier escaped, *id.* ¶ 86. With the help of sympathetic Free Syrian Army rebels, he made his way to the Turkish border and then back to the United States. *Id.* ¶ 88.

## II.    QIB's Support of Terrorism.

Like any enterprise, terrorist groups require money to operate. *Id.* ¶ 101. But unlike legitimate enterprises, they must "rely on creative fundraising strategies and sympathetic financial institutions and individuals to evade anti-terrorism financing laws." *Id.* Syrian terrorist groups turned to Qatar, a permissive jurisdiction for terrorism financing, for support. *Id.* ¶¶ 102–04. QIB was no exception.

At least by May 2013, QIB agreed to open an account for Saad bin Saad al-Kabi, who was later designated a Specially Designated Global Terrorist by the Department of the Treasury. *Id.* ¶¶ 111–16. The Nusra Front asked al-Kabi to fundraise for it, and he agreed to do so. *Id.* ¶ 113. He used the QIB account to run a campaign, called Madid Ahl al-Sham, the Madid campaign, to raise money for the Nusra Front. *Id.* ¶ 117. It was no surprise al-Kabi turned to QIB. The bank had longstanding ties to terrorism supporters. Its board included open Hamas supporter Yusuf al-Qaradawi, *id.* ¶¶ 125–30, and it maintained relationships with banks with known links to al-Qaeda, *id.* ¶¶ 131–134.

With the QIB account set up, al-Kabi launched a social media blitz for the Madid campaign to raise money for the Nusra Front. *Id.* ¶¶ 139–202. The posts asked donors to send money for the Nusra Front to al-Kabi's QIB account. *E.g.*, *id.* ¶¶ 163–166. The campaign was a success. By June 2013, a month before Schrier's escape, the campaign had raised four million Qatari riyals—enough to equip seven hundred terrorists. *Id.* ¶¶ 194–196.

QIB knew what al-Kabi's account was for. It had due diligence policies to alert it when its services were used to finance terrorism. *Id.* ¶¶ 243–246. Those policies gave it knowledge that the al-Kabi account was a conduit for financing the Nusra front. *Id.* ¶¶ 252, 254–59. Yet QIB let the account be used this way till late 2014—more than a year after Schrier's escape—until the Qatari government shut

the Madid campaign down because it was "known for financing extremists in Syria." *Id.* ¶¶ 204–09.

QIB supported Syrian terrorist groups in other ways, too. It maintained eight bank accounts for Qatar Charity, a known al-Qaeda supporter with longstanding ties to terrorism. *Id.* ¶¶ 264–70, 296. Qatar Charity actively supported Ahrar al-Sham, the group that held Schrier "in trust" for the Nusra Front. *Id.* ¶ 271. Like the Nusra Front, Ahrar al-Sham used violence to achieve its political ends. A video it made in December 2012, shortly before Schrier's kidnapping, shows its members blowing up buildings, buses, and cars, and announces its goal of creating an Islamist Syria. *Id.* ¶¶ 272–75. That same video thanks Qatar Charity for "aid and assistance" and includes the Qatar Charity logo. *Id.* ¶ 274. QIB knew of Qatar Charity's support of terrorism in Syria, again thanks to its due diligence policies. *Id.* ¶ 307. Yet it allowed Qatar Charity to use its services to finance Syrian terrorism. *Id.* ¶ 297. What's more, in 2012, the year before Schrier's capture, QIB gave Qatar Charity 500,000 Qatari riyals to fund its work in Syria. *Id.* ¶ 286.

In addition to these accounts, QIB offered access to the U.S. financial system via its three correspondent accounts at JPMorgan Chase, Standard Chartered, and Deutsche Bank. *Id.* ¶¶ 223–25. A correspondent bank is a financial institution that establishes an account for another bank to receive deposits from or send payments to other banks. *Id.* ¶ 216. So, for example, if a Saudi bank customer needs to send

a payment to a QIB customer, and the two banks had no relationship, the banks would use a correspondent bank to facilitate the transfer. *Id.* ¶ 219.

Around the time of Schrier's captivity, QIB executed six relevant transactions in its New York correspondent accounts. The details are redacted in below table per the district court's protective order, and Schrier has contemporaneously filed a motion for leave to file the unredacted brief under seal. The transaction documents corresponding to the below transactions are exhibits A through F to QIB's sealed Motion to Dismiss, Doc. 169.

| Date | USD Amt. | Originator | Beneficiary | N.Y. Correspondent Bank | Memo |
|------|----------|------------|-------------|-------------------------|------|
| ██ | ██ | █ | ███ | ██ | ██ |
| ██ | ██ | █ | ██ | █ | |
| ██ | █ | █ | ███ | ██ | █ |
| ██ | ██ | █ | █ | ██ | ██ |
| ██ | ██ | █ | ██ | ██ | ██ |
| ██ | ██ | ██ | ██ | ██ | ██ |

At its 30(b)(6) deposition, QIB refused to testify whether these transactions supported the Nusra Front or Ahrar al-Sham. Doc. 158 at 28 (citing Doc. 170,

Response Ex. C).  Indeed, it refused to testify whether ████████████

████████████████████████████████████████

██████████████████.  *Id.*  As discussed below, QIB's silence in the

face of these questions provides evidence that ████████████████████

████████████████████████, and that the transactions in its

correspondent accounts benefited those groups.

### III.    These Proceedings.

In January 2020, Schrier sued QIB in federal court in Florida, asserting claims

under the ATA and state tort law.  Doc. 1 ¶¶ 246–369.  Schrier promptly delivered

the Complaint and Summons to QIB's Patriot Act agent in New York.  *See* Doc. 6.

The then-operative version of the Patriot Act required QIB to maintain an agent to

"accept service of legal process for records regarding [its] correspondent account[s]"

from the Secretary of the Treasury or the Attorney General.   31 U.S.C.

§ 5318(k)(3)(A), (B); *see also* Pub. L. 116-283 § 6308, 134 Stat. 3388, 4590–91

(2021) (amending 31 U.S.C. § 5318(k)(3)).  QIB appeared through counsel shortly

thereafter and moved to dismiss.

In a September 30, 2020 order, the district court dismissed the complaint

without prejudice.  Doc. 74.  The district court's oral ruling explained that delivery

to the Patriot Act agent did not effect service and that Schrier did not establish

personal jurisdiction.  Doc. 75 at 5:10–11, 8:19–20.  The district court allowed

jurisdictional discovery, however, finding that Schrier "made a prima facie case" for personal jurisdiction. Doc. 75 at 18:1–6; Doc. 74. The district court directed Schrier to file an amended complaint, serve it on QIB, and complete jurisdictional discovery.

Schrier filed an Amended Complaint, Doc. 76, and had the Clerk of Court serve QIB under Federal Rule of Civil Procedure 4(f)(2)(C)(ii) by courier to Doha in October 2020, *see* Doc. 78. Schrier received a delivery confirmation. *See* Doc. 79. But for reasons that are not clear, the Amended Complaint was returned "undeliverable" to the district court clerk over a month later. *See* Doc. 84.

To ensure proper service, Schrier moved for leave to serve QIB by alternative means under Federal Rule of Civil Procedure 4(f)(3), which allows international service as the court orders. Doc. 87. The magistrate judge granted the motion and directed Schrier to serve QIB once more by courier and, failing that, by email. Doc. 97. Schrier complied on March 17, 2021 by delivered the Complaint and Summons to QIB via Fedex. Doc. 98. QIB objected to this form of service, Doc. 101, but the district court overruled the objection, Doc. 121. The district court further ruled that Schrier's compliance with the magistrate judge's order constituted proper service, and it ordered jurisdictional discovery to begin. Doc. 121.

Schrier propounded jurisdictional discovery and took a 30(b)(6) deposition of QIB. QIB produced records of transactions in its U.S. correspondent accounts. But at its deposition, QIB obstructed inquiry into those transactions. It refused to answer

plainly relevant questions about whether correspondent account transactions financed the Nusra Front or Ahrar Al-Sham.  Doc. 158 at 28.

With the discovery he had, Schrier filed a Second Amended Complaint, Doc. 149, and QIB again moved to dismiss, Doc. 156.  The district court granted the motion on September 30, 2022, concluding that it lacked personal jurisdiction.  Doc. 182 at 2.  The district court did not reach the merits or address QIB's discovery misconduct.  *See id.*  Schrier timely appealed.  Doc. 183.

## SUMMARY OF THE ARGUMENT

On "plenary" review, this Court should reverse the district court's dismissal for lack of personal jurisdiction.  *Del Valle*, 2022 WL 17101160, at *2.  Schrier satisfied the three elements required for personal jurisdiction: (1) he properly served the Complaint and Summons; (2) he invoked three statutes that "confer jurisdiction over" QIB; and (3) the exercise of jurisdiction comports with due process.  *Republic of Panama v. BCCI Holdings (Luxembourg), S.A.*, 119 F.3d 935, 942 (11th Cir. 1997).

Schrier served QIB with process in the United States and in Qatar.  Schrier effected service in the United States by delivering the summons to QIB's Patriot Act agent in New York, based on the ATA nationwide service provision authorizing service in "any district" where a defendant "has an agent."  18 U.S.C. § 2334(a).  The district court erred in ruling that QIB's Patriot Act agent is not "an agent" under

this provision. The district court did allow Schrier to serve QIB in Qatar under Federal Rule of Civil Procedure 4(f)(3). *See* Doc. 97. QIB did not dispute the effectiveness of service in Doha and thus waived it. *See* Fed. R. Civ. P. 12(h).

Based on this service, the district court should have exercised jurisdiction under the ATA or Rule 4(k)(2), which authorizes jurisdiction where (1) a defendant is not subject to jurisdiction in any state court, and (2) jurisdiction comports with Fifth Amendment due process. Under the ATA or Rule 4(k)(2), the district court could exercise jurisdiction consistent with Fifth Amendment due process, meaning it could aggregate QIB's contacts with the United States as a whole. *Oldfield v. Pueblo de Bahia Lora, S.A.*, 558 F.3d 1210, 1220 (11th Cir. 2009); *Republic of Panama*, 119 F.3d at 942.

Jurisdiction comports with due process for three independent reasons. First, QIB used its correspondent accounts to finance the terrorist groups that injured Schrier. The district court's erroneous ruling was contrary to *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017, 1026 (2021), which rejected any causation requirement for personal jurisdiction. The district court moreover disregarded QIB's refusal to testify whether transactions in its U.S. correspondent accounts supported terrorism. QIB's silence is evidence that they did. Second, QIB conspired with al-Kabi and the Nusra Front to support terrorism in Syria, and so the district court should have imputed the Nusra Front's U.S. contacts

to QIB. The district court erroneously concluded that Rule 4(k)(2) does not authorize jurisdiction based on a conspiracy. In fact, Rule 4(k)(2) authorizes jurisdiction to the extent of due process, and conspiracy jurisdiction is consistent with due process. Third, the district court had jurisdiction based on the effects of QIB's support of terrorism in the United States—the pain and terror here that result from terrorism. *Mwani v. bin Laden*, 417 F.3d 1, 13 (D.C. Cir. 2005).

Schrier also asserts that the Fifth Amendment permits personal jurisdiction because it would not be "arbitrary or fundamentally unfair." *United States v. Yousef*, 327 F.3d 56, 111–12 (2d Cir. 2003). Schrier recognizes that the Court recently rejected this argument, *see Herederos de Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303 (11th Cir. 2022), but preserves it for further review.

Alternatively, the district court had jurisdiction under the Florida Long-Arm Statute, Fla. Stat. § 48.193(1)(a)2. The Nusra Front committed conversion in Florida, and the district court should have imputed that contact to QIB due to its conspiracy with the Nusra Front.

Finally, the Court should reverse because the district court failed to exercise its discretion whether to sanction QIB for discovery misconduct. At its deposition, QIB refused to answer direct questions about whether transactions in its New York correspondent accounts financed terrorism. Schrier requested the district court

sanction QIB with an adverse inference.  Doc. 158 at 28–29.  The district court did not address this request or mention QIB's refusal to testify.

## ARGUMENT AND CITATIONS OF AUTHORITY

Schrier satisfied the three elements required for the exercise of personal jurisdiction: (1) he properly served the complaint and summons; (2) he invoked three statutes that "confer jurisdiction over" QIB; and (3) "the exercise of jurisdiction comports with due process." *Republic of Panama*, 119 F.3d at 942.  The district court's erroneous ruling, among other things, took too narrow a view of jurisdiction after *Ford Motor Co.* and disregarded that QIB's refusal to testify about U.S. correspondent account transactions constitutes competent evidence from which the court could infer that QIB's testimony would have been unfavorable.

On "plenary" review, *Del Valle*, 2022 WL 17101160 at *2, this Court should reverse the dismissal for lack of jurisdiction.  QIB submitted some evidence with its motion the Court may consider, but the Court "accept[s] the allegations stated in the complaint as true" "[t]o the extent" the evidence "do[es] not contradict [the] pleadings." *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1215 (11th Cir. 1999); *see Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990) (The "court must accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits.").  In the event of a conflict in the evidence, "the court

must construe all reasonable inferences in favor of the plaintiff." *Madara*, 916 F.2d at 1514.

## I.    Schrier effected service on QIB in the United States and in Qatar.

Schrier served QIB in the United States via QIB's registered Patriot Act agent and in Qatar via delivery of the Complaint and Summons.  The district court erroneously held that delivery to the Patriot Act agent did not suffice for service. That error affects the personal jurisdiction analysis, so Schrier challenges the ruling. However, QIB did not dispute that Schrier validly served it in Qatar, and so the Court should at minimum conclude that QIB received valid service there.

### A. Schrier properly served QIB's Patriot Act agent in New York under the ATA.

Shortly after filing this action, Schrier served the Complaint and Summons on QIB in New York, on QIB's Patriot Act agent, Global Payments Advisory Group ("GPAG").  Doc. 6.  The ATA's nationwide service provision allows service of process "in any district where the defendant resides, is found, or has an agent."  18 U.S.C. § 2334(a).  Service on QIB's agent satisfied this statute.

The district court nonetheless insisted that "GPAG lacked authority to accept this kind of service."  Doc. 182 at 14.  Instead, the district court ruled that GPAG can accept only subpoenas from the Attorney General or the Secretary of the Treasury under a provision of the Patriot Act, 31 U.S.C. § 5318(k)(3)(A).  That

ruling misinterpreted the statute and discounted evidence that the Patriot Act agent accepted service on QIB's behalf.

The ATA authorizes service on "an agent," full stop.  18 U.S.C. § 2334(a).  An agent is "someone who is authorized to act for or in place of another."  *Agent*, Black's Law Dictionary (11th ed. 2019).  Below, QIB conceded that GPAG is its agent.  Doc. 18 at 7–8.  That should end the inquiry.  Schrier delivered the Complaint and Summons to an agent, thus perfecting service under the ATA's nationwide service provision.

The district court rejected this straightforward reading.  It read the reference to "an agent" to require service on "an agent authorized to accept service of process."  Doc. 182 at 14.  But Congress did not intend to limit service to agents authorized to accept process in the ATA.  Comparison to other service statutes illustrates the point.  Rule 4 allows service on a corporation's "agent *authorized by appointment or by law to receive service of process*."  Fed. R. Civ. P. 4(h)(1)(B) (emphasis added).  Other nationwide service statutes likewise specify service on agents authorized to accept service of process.  *See, e.g.*, 42 U.S.C. § 9613(e) (CERCLA: service authorized "in any district where the defendant … *has appointed an agent for the service of process*" (emphasis added)); 28 U.S.C. § 1608(b)(2) (FSIA: service authorized "by delivery of a copy of the summons and complaint … to any other agent *authorized by appointment or by law to receive service of process* in the United States"

(emphasis added)).  By contrast, in the ATA Congress specified merely service on "an agent," not necessarily one authorized to accept service of process.

This Court can "not ignore the Congress's decision to leave" the word agent "unmodified." *Sargeant v. Hall*, 951 F3d 1280, 1283 (11th Cir. 2020) (quotation omitted).  Congress use of a word "modified in one instance but not the other" indicates its intent to give the words a different meaning. *Id.*  The district court did not recognize this distinction.  Instead, it added language Congress did not when it held that only an agent authorized to accept service of process will do.  The Court should correct the district court's statutory interpretation.

The ATA's broad authorization for service promotes Congress's purposes.  A recent amendment to the ATA affirms that the statute creates "the broadest possible basis, consistent with the Constitution of the United States," for terrorism victims to "seek relief against … entities … wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States."  Justice Against Sponsors of Terrorism Act of 2016, Pub. L. 114-222 § 2(b), 130 Stat. 852, 853 [hereinafter, "JASTA"].  Congress intended, in other words, to give terrorism victims every chance to seek relief in U.S. courts.  Under the district court's ruling, even QIB employees traveling to the U.S. on bank business might not be amenable to service if not authorized to accept summons.  That result is not what Congress

17

intended when it authorized service on "an agent," whether designated by a principal to accept service or not.

The district court is undoubtedly correct that, as a general rule, a principal can limit an agent's authority.  Doc. 182 at 15–16 (citing cases).  But it is equally true that the legislature can designate individuals by law to receive service besides those a defendant authorizes to receive service.  *See Nelson v. Swift*, 271 F.2d 504, 505 (D.C. Cir. 1959) ("The phrase 'by law' refers to statutory provisions for substituted service.").  The district court cited *Nelson* for the general rule—that a principal sets the scope of an agent's authority—when *Nelson* in fact recognizes that Congress can enact "statutes authorizing substituted service upon a non-resident."  *Id.  Nelson* called on Congress to do just that and enact a statute "authorizing substituted service upon a non-resident property owner for private civil actions arising out of the property."  *Id.*  Nor is *Nelson* unique.  To give one example, this Court in *Henderson v. Cherry, Bekaert, & Holland* held that under Georgia law service on a non-partner employee of an accounting firm was effective even though the non-partner employee had "never been authorized as an agent by appointment or by law to accept service of process."  932 F.2d 1410, 1412 (11th Cir. 1991).  Contra the district court, it was within Congress's power to make QIB amenable to service via any agent, not just one designated by QIB to accept service of process in private civil actions.

Besides being contrary to Congress's intent, the district court's reliance on the general rule has bad consequences: it puts the validity of service in the hands of terrorism supporting defendants, who can easily limit their agents' ability to accept service of ATA complaints. On the district court's view, QIB could validly limit the authority of a QIB employee visiting the United States on QIB business to accept service of Schrier's Complaint and Summons. Congress intended to make the courts available, not limit access at the whim of an ATA defendant.

Alternatively, the district court wrongly rejected evidence showing that QIB authorized GPAG to accept Schrier's Summons, thus creating an agency relationship. In response to a subpoena, GPAG produced an email chain showing that it promptly forwarded Schrier's Complaint and Summons after receipt. *See* Doc. 158-2. QIB's Senior Executive Manager for Financial Institutions (and 30(b)(6) designee) responded to request "on the basis of urgency the exact date and time on which GPAG had received the summon in discussion on behalf of QIB." *Id.* at 9. QIB hired U.S.-based attorneys shortly thereafter to appear on its behalf. *See* Doc. 8. This evidence establishes that GPAG accepted the summons on QIB's behalf. As authority the district court cited holds, "[a]cquiescence by the principal in conduct of an agent whose previously conferred authorization reasonably might include it, indicates that the conduct was authorized." *Ramos-Barrientos v. Bland*, 661 F.3d 587, 600 (11th Cir. 2011).

Service on QIB in the United States means the district court should have asserted jurisdiction under the ATA's nationwide service provision. The nationwide service provision authorizes the district court to exercise jurisdiction based on QIB's "aggregate contacts with the nation as a whole." *Republic of Panama*, 119 F.3d at 946–47. Schrier discusses those contacts *infra* in Section II.

**B. Schrier undisputedly served QIB in Doha, Qatar under Rule 4(f).**

After the district court wrongly rejected service on QIB's New York agent, Schrier served QIB in Qatar via courier delivery. Pursuant to Federal Rule of Civil Procedure 4(f)(3), Schrier obtained an order court authorizing service via courier without a signature, given the coronavirus pandemic. Doc. 97; Doc. 121 (overruling objection to magistrate order). QIB did not contest the validity of this service in its Motion to Dismiss. *See generally* Doc. 156-1. As the district court recognized, Doc. 182 at 19, by "omitting" this defense from is motion, QIB "waived" any service defense, *see* Fed. R. Civ. P. 12(h). Thus, Schrier properly and undisputedly served QIB under Rule 4(f)(3).

**II. The ATA and Rule 4(k)(2) confer a statutory basis for personal jurisdiction consistent with due process under the Fifth Amendment.**

The ATA and Rule 4(k)(2) both provide statutory bases for personal jurisdiction over QIB. The district court correctly ruled that Rule 4(k)(2) confers personal jurisdiction, but it disagreed as to the ATA based on its ruling that Schrier

did not serve QIB in the United States. That ruling on service was error, as discussed above, and so the exercise of jurisdiction under the ATA is proper.

Exercising jurisdiction under either statute also satisfies due process. Under both statutes, the Fifth Amendment provides the due process framework, and the jurisdictional analysis considers all QIB's contacts with the United States as a whole. *See SEC v. Marin*, 982 F.3d 1341, 1349–50 (11th Cir. 2020) ("Where … personal jurisdiction is based on a federal statute authorizing nationwide service of process, the applicable forum for minimum contacts purposes is the United States, not the state in which the district court sits." (quotation omitted)); *Oldfield*, 558 F.3d at 1220. Schrier identified three independent grounds for jurisdiction: (1) transactions in QIB's U.S. correspondent accounts; (2) QIB's conspiracy with the terrorists that kidnapped and tortured Schrier; and (3) the effects of QIB's support of terrorism in the United States. The Court should therefore reverse the district court's ruling that it lacks jurisdiction.

## A. The ATA's nationwide service provision provides a statutory basis for personal jurisdiction.

Schrier's service on QIB in the United States via QIB's New York agent means the ATA nationwide service provision, 18 U.S.C. § 2334, confers personal jurisdiction. "When a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction." *Republic of Panama*, 119 F.3d at 942. Further, under a federal jurisdictional statute, "the constitutional limits

of due process derive from the Fifth, rather than the Fourteenth, Amendment." *Id.* Thus, under the ATA, the Court must consider QIB's "aggregate contacts with the nation as a whole rather than [its] contacts with the forum state." *Id.* at 946–47. In other words, under the ATA, any of QIB's contacts with the United States may satisfy due process. Schrier discusses due process *infra*.

### B. Rule 4(k)(2) provides an additional statutory basis for personal jurisdiction.

The district court correctly held it could exercise jurisdiction under Federal Rule of Civil Procedure 4(k)(2). "Rule 4(k)(2) operates as a 'national long-arm statute.'" *Weinstock v. Abu Marzook*, No. 17-23202, 2019 WL 1470245, at *2 (S.D. Fla. Apr. 3, 2019) (quoting *Fraser v. Smith*, 594 F.3d 842, 848 (11th Cir. 2010)). Rule 4(k)(2) authorizes jurisdiction over federal law claims where (1) "the defendant is not subject to jurisdiction in any state's courts" and (2) "exercising jurisdiction is consistent with the United States Constitution and laws." *See id.* Schrier asserts federal law claims under the ATA, and he may invoke Rule 4(k)(2) based on service on QIB by courier in Qatar under Rule 4(f). *Mwani*, 417 F.3d at 11 (serving "summons … pursuant to Rule 4(f)" authorizes invocation of Rule 4(k)(2)).

QIB's refusal to identify a court where it is subject to jurisdiction meets Rule 4(k)(2)'s next condition. "[T]o defeat the assertion of jurisdiction under Rule 4(k)(2), the *defendant* bears [the] burden to show that [it] *is* subject to jurisdiction in another state's courts of general jurisdiction." *Weinstock*, 2019 WL 1470245, at *2.

"[I]f the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)." *Oldfield*, 558 F.3d at 1218 n.22. This burden-shifting rule spares the parties and district courts the burden of "analyz[ing] the laws of all fifty states to ascertain whether any state court of general jurisdiction has jurisdiction over the defendant." *Id.* (citing *ISI Int'l, Inc. v. Borden Ladner Gervais, LLP*, 256 F.3d 548, 552 (7th Cir. 2001) (Easterbrook, J.)).

Below, QIB consistently refused to identify a forum that would have personal jurisdiction. *See* Doc. 156-1 at 13. Citing *Oldfield*, the district court correctly ruled that "QIB cannot avoid jurisdiction under Rule 4(k)(2) without identifying a state where it is subject to personal jurisdiction." Doc. 182 at 29. *Oldfield* compels this Court to reach the same conclusion.

Rule 4(k)(2)'s final requirement, that jurisdiction be "consistent with the Constitution and laws of the United States," means that jurisdiction must "comport[] with due process." *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000). As with the ATA, the Fifth Amendment provides the scope of due process, so the Court must consider QIB's contacts with the entire United States. *See Oldfield*, 558 F.3d at 1219–20.

### C. The exercise of jurisdiction under either the ATA or Rule 4(k)(2) comports with Fifth Amendment due process.

The Fifth Amendment permits the exercise of personal jurisdiction if "the defendant has sufficient minimum contacts with the forum" and "maintenance of the suit" would not "offend traditional notions of fair play and substantial justice." *Herederos*, 43 F.4th at 1308. QIB has three categories of minimum contacts with the United States that support the exercise of personal jurisdiction consistent with Fifth Amendment due process: (1) it used its correspondent accounts to finance the Syrian terrorist groups that harmed Schrier; (2) it conspired with those same terrorist groups; and (3) its conducts was aimed at the United States and caused effects here. This conduct satisfies the three elements of the minimum-contacts test: (1) QIB "purposefully availed [itself] of the privilege of conducting activities within the forum," (2) Schrier's claims "arise out of or relate to one of [QIB's] contacts in the forum," and (3) jurisdiction will not offend "traditional notions of fair play and substantial justice." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (quotation omitted).

Before turning to the analysis, a word about the effect of the Supreme Court's recent decision in *Ford Motor Co.*, 141 S. Ct. 1017. *Ford* put to rest the notion that "only a strict causal relationship between the defendant's in-state activity and the litigation will" suffice for personal jurisdiction. *Id.* at 1026. Rather, "some relationships will support jurisdiction without a causal showing." *Id.*; *see also*

*Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 234 (D.C. Cir. 2022) ("[T]he defendants' forum contacts need not have caused or given rise to the plaintiffs' claims.").

### i.   QIB used its U.S. correspondent accounts to process six transactions that financed the Syrian terrorist groups that harmed Schrier.

Jurisdictional discovery revealed six transactions in QIB's U.S. correspondent accounts around the time of Schrier's kidnapping, captivity, and torture.  *See* Doc. 156-1 at 15, 16.  Three came before or during Schrier's captivity.  *Id.* at 15.  Three came shortly after Schrier's escape.  *Id.* at 16.  These transactions create minimum contacts that subject QIB to personal jurisdiction in the United States.

On the first minimum-contacts prong, purposeful availment, QIB maintained three correspondent accounts in New York for the purpose of giving its customers access to the dollar and to facilitate cross-border payments.  Doc. 149 ¶¶ 223–25, 230, 300–06; Doc. 158-3 at 9–12.   "The applicable case law unequivocally establishes that maintaining bank accounts in the forum for purposes of carrying out the subject transactions constitutes purposeful availment and invocation of the benefits of the forum's laws."  *SEC v. Carrillo*, 115 F.3d 1540, 1546 (11th Cir. 1997); *see also Al Rushaid v. Pictet & Cie*, 68 N.E.3d 1, 9 (N.Y. 2016) ("[D]eliberate use" of a correspondent account "that is approved by the foreign bank on behalf of and for the benefit of a customer … demonstrates volitional activity constituting

transaction of business.").  The district court did not hold to the contrary.  *See* Doc. 182 at 32–38.

The six transactions in QIB's three New York correspondent accounts also "relate to" to Schrier's claims, thus satisfying the second minimum-contacts prong. *Louis Vuitton*, 736 F.3d at 1355.  Again, these "forum contacts need not have caused or given rise to [Schrier's] claims." *Atchley*, 22 F.4th at 235.  When it comes to correspondent accounts, an ATA defendant "reasonably could … foresee[] that repeatedly availing itself of New York and its laws to execute ... Transfers would subject it to jurisdiction in the United States with respect to the *overall course of conduct of which those transfers were a part*." *Weiss v. Nat'l Westminster Bank, PLC*, 176 F. Supp. 3d 264, 287 (E.D.N.Y. 2016) (emphasis added).

One transaction executed shortly after Schrier's escape plainly fits the bill: it flowed from ████████████████████████, *see* Doc. 169, Ex. F, Ex. I, ████████████████████████████████ ██████████, Doc. 154, ¶¶ ███████████.  Schrier alleged, and QIB did not dispute, that ████████████████████████████████ ████████████████████.  Doc. 154 at ¶ █.  Schrier further alleged that ████████████████████████████ ███████████████████████.  *Id.* ¶¶ ██████.

QIB did not controvert these allegations, and the Court must accept them as true. *See Posner*, 178 F.3d at 1215.

Moreover, QIB refused to testify whether this transaction supported the Nusra Front or Ahrar al-Sham when asked directly at its 30(b)(6) deposition. *See* Doc. 158 at 28. From that, the Court can infer that the transaction would have supported those groups. *See, e.g.*, *See, e.g.*, *United States v. Wilchcombe*, 838 F.3d 1179, 1191 (11th Cir. 2016) ("silence" can be "admissible as substantive evidence" in some cases); *United States v. Parker*, 376 F. App'x 1, 18 (11th Cir. 2010) (unpublished) ("silence … constituted admissible evidence"). Courts allow adverse inferences from silence. *See Hamilton Grp. Funding, Inc. v. Basel*, 311 F. Supp. 3d 1307, 1315–16 (S.D. Fla. 2018); *see also Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify."); *Experience Hendrix, LLC v. Chalpin*, 461 F. Supp. 2d 165, 171 (S.D.N.Y. 2006); *Bouzo v. Citibank, N.A.*, 96 F.3d 51, 60 (2d Cir. 1996) (adverse inference from "incredible testimony" at deposition and destruction of documents); *SEC v. Levine*, 279 F. App'x 6, 8 (D.C. Cir. 2008) (adverse inference for "failure to testify").

This transaction relates to Schrier's claims in two ways. First, it represented a continuation of QIB's "overall course of conduct" in █████████████████ ████████████████████████████████. *Weiss*, 176 F. Supp. 3d at 287.



▮▮, Doc. 154 ¶ ▮▮, while the terrorist group held Schrier captive, and, according to the transaction records, QIB ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *see* Doc. 169, Ex. F, Ex. I. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Doc. 154 ¶¶ ▮▮.

A New York transfer that is part of the same overall course of wrongdoing will support jurisdiction, particularly when the bank "knew that funds it transferred … were being used to support a terrorist organization." *Weiss*, 176 F. Supp. 3d at 280. Schrier's lawsuit "seek[s] redress for the allegedly unlawful provision of banking services of which the wire transfer[] [is] a part." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013). The use of a correspondent account "to achieve the very wrong alleged"—here, financing ▮▮ ▮▮▮▮▮▮—creates a relationship between QIB's New York contacts and Schrier's claims. *Id.*

Second, Schrier's kidnapping and captivity and the transfer both served the same goal of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The kidnapping and captivity achieved this by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Doc. 154 ¶¶ ▮▮. The transaction achieved this by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Schrier's captivity and the transaction are thus

28

of a piece. Moreover, given the fungibility of money, *see Boim v. Holy Land Found.*, 549 F.3d 685, 698 (7th Cir. 2008) (en banc), the transaction replenished ████ ████ coffers after Schrier's escape. A post-escape transaction might reimburse a bad actor for goods or service provided to Schrier's captors before or during his captivity. That too relates to the wrong alleged. Terrorist organizations are going concerns; they depend on future income streams just like any enterprise. ████ ████ depended on bad actors to support its illicit, violent activities. QIB did so by providing financial services to ████████████████████████████ ████████████████████████. Doc. 154 ¶¶ ████. That is also the gravamen of Schrier's ATA claims: ████████████████ ████████████████████. Doc. 154 ¶¶ ████. Whether viewed part of the same course of conduct or as replenishing the coffers, the transaction using QIB's correspondent account relates to Schrier's ATA claims. And this "single act can support jurisdiction" because it create a "substantial connection with the forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985).

The district court declined to rely on this transaction and two other post-escape transactions *solely* because they "ran through QIB's accounts only *after* Schrier was released." Doc. 182 at 35. According to the district court, "as a matter of simple logic, transactions that post-date Schrier's escape cannot be 'related to' his

captivity—and their relationship to his kidnapping and detention isn't 'strong.'" Doc. 182 at 48. *Ford* rejected this "logic." To say, as the district court does, that a transaction must pre-date Schrier's escape to support jurisdiction is another way of saying a transaction must *cause* Schrier's claims to support jurisdiction. This Court cannot sanction that approach. *Ford* held that a "causation-only approach finds no support in this Court's requirement of a connection between a plaintiff's suit and a defendant's activities." 141 S. Ct. at 1026 (quotation omitted). This Court should correct the district court's return to a pre-*Ford* standard and hold that the relationship articulated above supports jurisdiction.

The remaining five transactions, three pre-escape and two post-escape, likewise relate to Schrier's claims. *See* Ex. 169, Ex. A, Ex. B., Ex. C, Ex. D., & Ex. E. To be sure, as the district court found, transaction documents for three pre-escape transactions suggest those transactions benefitted "legitimate organizations." Doc. 182 at 37 (emphasis removed). But the transaction documents are only part of the evidence. As with the transaction discussed above, at its 30(b)(6) deposition, QIB flatly refused to testify whether these transactions benefitted the Nusra Front or Ahrar al-Sham. *See* Doc. 158 at 28. QIB's refusal to answer provides evidence from which the Court can infer that those transactions *would have* benefitted the Nusra Front or Ahrar al-Sham. *See, e.g.*, *See, e.g.*, *Wilchcombe*, 838 F.3d at 1191; *Parker*, 376 F. App'x at 18; *Basel*, 311 F. Supp. 3d at 1315–16; *see also Baxter*, 425 U.S. at

318. QIB's use of "correspondent accounts … to achieve the very wrong alleged"—financing Syrian terrorist groups—suffices for jurisdiction. *Licci*, 732 F.3d at 171.

The district court's erroneous disregard of QIB's 30(b)(6) deposition led it to reject the relationship between these five transactions and Schrier's claims. The district court mischaracterized the inference to be drawn from QIB's silence as "inferences [Schrier's] drawn *in his brief*." Doc. 182 at 38. Schrier's brief pointed out that the district court could draw this inference, *see* Doc. 158 at 16, but the basis for the inference was actual evidence. Silence can itself be competent evidence. *See, e.g.*, *Wilchcombe*, 838 F.3d at 1191; *Parker*, 376 F. App'x at 18. This is particularly true where silence "persists in the face of accusation, since it is assumed in such circumstances that the accused would be more likely than not to dispute an untrue accusation." *United States v. Hale*, 422 U.S. 171, 176 (1975). QIB would naturally have testified these transactions did *not* support the Nusra Front or Ahrar al-Sham if they did not. QIB's refusal so testify was evidence the district court failed to acknowledge.

This Court reviews fact findings on a motion to dismiss for "clear error." *Louis Vuitton*, 736 F.3d at 1350. This is a deferential standard when the district court resolves conflicts in the evidence, but this Court "can and should consider … salient facts that were elicited, and uncontroverted." *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc). "[A] district court cannot write out of the record

31

undisputed facts by simply ignoring them." *Id.*  The district court clearly erred in holding there was no evidence that these transactions supported Syrian terrorism, when in fact the record contains evidence of QIB's silence.

None of this "mean[s] anything goes" for personal jurisdiction. *Ford*, 141 S. Ct. at 1026.  For example, the "'mere maintenance' of a correspondent account," without any transactions related to a terrorist group, cannot create a relationship that establishes jurisdiction. *Licci*, 732 F.3d at 171.  A correspondent account in such a case is not part of the "overall course" of misconduct.  But "[i]t should hardly be unforeseeable to a bank that selects *and makes use of* a particular forum's banking system that it might be subject to the burden of a lawsuit in that forum for wrongs related to … that use." *Id.* at 171–72 (emphasis added).  The transactions at issue, even those that came after Schrier's escape, relate to his claims.

The district court erred in finding that the six transactions had no relationship to Schrier's claims.  This Court should reverse.

### ii.    QIB conspired with the terrorists that kidnapped, tortured, and held Schrier.

QIB also conspired with the terrorists that kidnapped and tortured Schrier. The Court can thus impute the Nusra Front's U.S. contacts to QIB.  Under conspiracy jurisdiction, that is, QIB is subject to jurisdiction because the Nusra Front would be.

At the threshold, the district court held that it lacked power under Rule 4(k)(2) to assert jurisdiction based on a conspiracy.  Some district courts have so held. *See*

Doc. 182 at 44–45 (collecting cases). But district courts are not uniform in that. *See Rudersdal v. Harris*, No. 1:18-cv-11072, 2022 WL 263568, at *1 (S.D.N.Y. Jan. 28, 2022) (concluding "as dicta" that "a plaintiff may plead personal jurisdiction under Rule 4(k)(2) using a theory of conspiracy jurisdiction because the Second Circuit has expressly held that conspiracy jurisdiction is consistent with Constitutional Due Process"). No court of appeals has held that conspiracy jurisdiction is impermissible under Rule 4(k)(2). This Court should not be the first. The district court was wrong as a matter of first principles.

The viability of conspiracy jurisdiction under Rule 4(k)(2) follows from its requirements. Rule 4(k)(2) simply requires that jurisdiction be "consistent with the United States Constitution and laws"—that is, that jurisdiction "comport[] with due process." *See Consolidated Dev.*, 216 F.3d at 1291. "[F]ederal courts considering the federal constitutionality of conspiracy jurisdiction" under state long-arm statutes "have found the doctrine to be completely in line with" due process. *Kyko Global, Inc. v. Prithvi Info. Sols. Ltd.*, No. 2:18-cv-1290, 2020 WL 3654951, at *15 (W.D. Pa. July 6, 2020); *see also Charles Schwab v. Bank of Am. Corp.*, 883 F.3d 68, 86–87 (2d Cir. 2018). That includes the Southern District of Florida. *See eLandia v. Ah Koy*, 690 F. Supp. 2d 1317, 1330 (S.D. Fla. 2010) ("If … any member of a conspiracy committed tortious acts in Florida in furtherance of the conspiracy, then all of the conspirators are subject to personal jurisdiction in Florida."). This Court

has assumed the theory's validity.  *See Utd. Techs. Corp. v. Mazer*, 556 F.3d 1260, 1281 (11th Cir. 2009) ("Florida courts have held that the state's long-arm statute can support personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy, even if the defendant over whom personal jurisdiction is sought individually committed no act … Florida").  If conspiracy jurisdiction comports with due process under state long-arm statutes, there is no principled reason why it cannot apply under Rule 4(k)(2).  The due process clause is not more restrictive under Rule 4(k)(2) than it is under state law.

The district court also fell back on Supreme Court precedent requiring personal jurisdiction to "arise out of contacts that the defendant *himself* creates with the forum."  Doc. 182 at 46 (quoting *Walden v. Fiore*, 571 U.S. 277, 283 (2014)).  The district ignored, however, that a defendant can create his own contacts with a forum through the acts of others.  *See, e.g.*, *Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014) ("commission of some single or occasional acts of the corporate agent in a state may sometimes be enough to subject to the corporation to jurisdiction").  A tortfeasor in Georgia that directs another to go to Florida to commit a tort cannot escape liability in Florida with the excuse that all its conduct was in Georgia.

The same holds true for conspiracies. "In a conspiracy, every act and declaration of each member" is "the act and declaration of them all, even with respect to actions that took place before a conspirator joined." *Koch v. Royal Wine Merchs., Ltd.*, 907 F. Supp. 2d 1332, 1346–47 (S.D. Fla. 2012). That is why in criminal cases, a conspiracy may be tried "in any district where an overt act was committed in furtherance of the conspiracy" consistent with the Sixth Amendment, regardless whether the defendant sets foot in the district. *United States v. Smith*, 918 F.2d 1551, 1557 (11th Cir. 1990). "[A]n overt act may be committed *by any conspirator*, anyone who aids or abets a conspirator, or anyone a conspirator causes to act." *United States v. Bradley*, 644 F.3d 1213, 1255 n.87 (11th Cir. 2011) (emphasis added). The district court thus erred in concluding that a defendant cannot create an affiliation with a forum via participation in a conspiracy.

The district court also relied on what it called Rule 4(k)(2)'s "focus towards *the defendant*" as a reason to reject conspiracy jurisdiction. Doc. 182 at 47. But nothing in Rule 4(k)(2)'s text says a defendant must do some overt act in the forum to be subject to conspiracy jurisdiction. Rather, Rule 4(k)(2) allows for jurisdiction to the limit of due process. *See Consolidated Dev.*, 216 F.3d at 1291. Of course, as the district court observed, Rule 4(k)(2) requires "[s]erving a summons" on the defendant and that the "defendant" not be "subject to jurisdiction in any state's courts of general jurisdiction." Those references do not reveal a "focus" on the defendant

that would exclude conspiracy jurisdiction. "The *plaintiff* is responsible for having the summons and complaint served." Fed. R. Civ. P. 4(c)(1) (emphasis added). And a defendant *could* be subject to jurisdiction in state courts based on a conspiracy, as discussed. The district court offered no reason the same could not be true of federal court under Rule 4(k)(2).

Applying the correct law, QIB is subject to jurisdiction by its participation in a conspiracy with al-Kabi and the Nusra Front. The Complaint alleges all the requisites of a conspiracy: (1) the existence of an agreement between QIB, al-Kabi, and the Nusra Front, (2) QIB's participation in the conspiracy by allowing al-Kabi to use its services to fundraise, and (3) acts by the Nusra Front in support of the conspiracy in the United States. *See Charles Schwab Corp.*, 883 F.3d at 86–87; *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).

At the outset, recall that al-Kabi became the Nusra Front's agent by agreeing to fundraise for them. Doc. 149 ¶¶ 112–118, 120, 247–249; *see also Stansell v. FARC*, 771 F.3d 713, 724 n.6, 732 (11th Cir. 2014) (entities that "assisted the FARC's financial or money laundering network" qualified as FARC's agents). QIB became part of this agreement when it opened an account for al-Kabi to fundraise for the Nusra Front, all while knowing of al-Kabi's Nusra Front affiliation and his purpose in opening the account. Doc. 149 ¶¶ 111–122. Schrier alleged QIB's knowledge with specificity. QIB had due diligence policies to alert it to terrorism

financing, and those policies revealed al-Kabi's terrorist affiliation. *Id.* ¶¶ 243–52, 254–259. What's more, the Madid campaign, al-Kabi's fundraising vehicle, "was at one point arguably the most visible public fundraising campaign for Syrian relief in Qatar." *Id.* ¶ 242. It featured on social media and in a speech by a prominent cleric at the Doha Grand Mosque. *Id.* ¶¶ 183–85. Al-Kabi's QIB account appeared in those posts and that speech. *Id.* ¶¶ 151, 164–165, 185. At its 30(b)(6) deposition, QIB refused to testify to ███████████████████████████████ ███████████████████████████████████. Doc. 170, Ex. C. And QIB continued to provide its services for more than a year *after* Schrier's escape, when the Qatari government shut down the Madid campaign because it was "known for financing extremists in Syria." Doc. 149 ¶ 208. These allegations show that QIB agreed with al-Kabi and the Nusra Front to support acts of terrorism, and that it offered its services for that purpose. QIB offered no evidence to rebut the allegations, so the Court must accept the allegations as true. *See Posner*, 178 F.3d at 1215.

The Nusra Front's acts in furtherance of the conspiracy are thus attributable to QIB. *See Burger v. Hartley*, 896 F. Supp. 2d 1157, 1169 (S.D. Fla. 2012) ("To be held liable for the acts of all co-conspirators, each co-conspirator need only know of the scheme and assist in it in some way."); *see also Halberstam*, 705 F.2d at 476 (conspiracy makes "[e]ach … responsible for the others' actions"). The Nusra Front

committed several intentional torts in furtherance of the conspiracy. Its agents stole Schrier's debit and credit cards and used his accounts to rack up thousands of dollars of charges. Doc. 149 ¶¶ 73–74. That conduct amounted to conversion. The Nusra Front also tortured Schrier to induce a false confession to being a CIA agent to influence the U.S. government to pay a ransom. *Id.* ¶¶ 58–72. And, finally, the Nusra Front intended its kidnapping to sow pain and cause terror in this country, by demonstrating its ability to kidnap the citizen of a superpower. *Id.* ¶ 72. These acts were part of the conspiracy's goal of engaging in terrorism in Syria, and QIB supported that goal through the provision of financial services.

The Nusra Front's contacts create jurisdiction in the U.S. An "intentional tort, expressly aimed at … the forum whose effects were suffered in the forum" satisfies the minimum contacts test. *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008). These acts also relate to Schrier's claims. The Nusra Front could only engage in these torts because it kidnapped him and held him captive—conduct QIB, in turn, made possible by financing the Nusra Front. Schrier seeks to hold QIB liable for aiding and abetting the Nusra Front and conspiring with it. *See* Doc. 149 ¶¶ 310–324, 337–370.

In sum, the district court had personal jurisdiction based on QIB's conspiracy with al-Kabi and the Nusra Front. The district court wrongly ruled it lacked power to exercise jurisdiction based on the conspiracy. This Court should set the law

straight and hold that the conspiracy provided a basis for jurisdiction consistent with due process. A bank that conspires with terrorists to harm Americans should foresee that its co-conspirators will take action with effects in the United States.

### iii.    QIB's conduct caused effects in the United States sufficient for personal jurisdiction.

There is a third basis for personal jurisdiction under Rule 4(k)(2). QIB's conduct—supporting anti-American terrorist groups that targeted and kidnapped U.S. nationals—was "expressly aimed" at the U.S. *Calder v. Jones*, 465 U.S. 783, 790 (1984). The district court had jurisdiction over QIB based on the "effects" of that conduct in the U.S. *See Mwani*, 417 F.3d at 13; *see also Calder*, 465 U.S. at 790 (jurisdiction proper based on "the effects of … Florida conduct in California").

Terrorist attacks abroad that target Americans are designed to "cause pain and sow terror in the [victim's] home country, the United States." *Mwani*, 17 F.3d at 13. Indeed, the acts of terrorism here had effects: the U.S. government opened an investigation, and Schrier's family and friends "feared the worst." Doc. 149 ¶¶ 62– 72. By supporting the terrorists that targeted Americans, QIB aligned itself with conduct that was purposefully directed at the United States. *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 35 (D.D.C. 2010); *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1336 (D. Utah 2006) (conduct giving rise to terrorism victim's injuries, including "financing," subjected the defendant to personal jurisdiction).

That QIB did not kidnap Schrier itself makes no difference to jurisdiction. "The effects doctrine … creates personal jurisdiction even when a defendant did not personally participate in the attack itself." *Morris*, 415 F. Supp. 2d at 1336. Attacks "require more than a triggerman—they also require *financing*, planning, and coordinating." *Id.* (emphasis added). QIB knowingly provided financial services to the Nusra Front via the al-Kabi account. Doc. 149 ¶¶ 111–22, 247–52, 254–59. QIB should be subject to jurisdiction for the effects of its knowing conduct.

The district court erroneously rejected this argument by distinguishing three cases Schrier cited: *Mwani*, *Morris*, and *Wultz*. The following discussion takes each in turn.

*Mwani* was a suit by Kenyan nationals against Osama bin Laden and al-Qaeda for the bombing of the U.S. Embassy in Nairobi. 417 F.3d at 4. The district court read *Mwani* as exercising jurisdiction based on "extensive contacts with the United States"—including through various media outlets—and because it involved "multiple terrorist attacks on American soil." Doc. 182 at 39. The district court's reading does not hold up. *Mwani* did not rely on the media outlet contacts as a basis for jurisdiction, and it called the lower court in that case's "focus on specific, *physical* contacts between defendants and the forum" a "fundamental problem" with its analysis. 417 F.3d at 12. Nor were other terrorist attacks on American soil necessary to its analysis. Instead, *Mwani* held that "[t]he defendants' decision to

40

purposefully direct their terror at the United States, and the fact that the plaintiffs' injuries arose out of *one of* those terrorist activities, should suffice to cause the defendants to reasonably anticipate being haled into an American court." *Id.* at 14 (emphasis added and quotation omitted). Thus, exercising jurisdiction based on QIB's support of the Nusra Front and Ahrar al-Sham is perfectly compatible with *Mwani*.

In *Morris*, two American soldiers sued a Canadian al-Qaeda member who "contributed to al Qaeda in many ways," including "provid[ing] *substantial financial support* and personnel assistance." 415 F. Supp. 2d at 1327 (emphasis added). He also "encouraged his sons to join al Qaeda and to carry out its work." *Id.* The district court distinguished *Morris* based on what it saw as QIB's more limited contacts with the United States—three transactions preceding Schrier's escape. Doc. 182 at 41. That distinction misses the point. The effects test is not a matter of totting up transactions in New York, but rather of assessing whether the defendant engaged in activity *elsewhere* directed at the forum. *See, e.g.*, *Mwani*, 417 F.3d at 12 ("fundamental problem with the court's analysis was its focus on specific, *physical* contacts between the defendants and the forum"). "So long as a commercial actor's efforts are 'purposefully directed' towards" the forum, the Supreme Court has "consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Burger King*, 471 U.S. at 476.

Properly read, *Morris* took jurisdiction based on the defendant's "active[] participat[ion] in" and "al Qaeda's terrorist agenda," including financial support of al Qaeda. 415 F. Supp. 2d at 1330, 1336. Like the *Morris* defendant, QIB provided substantial financial assistance to the Nusra Front via al-Kabi and to Ahrar al-Sham via Qatar Charity. The support of terrorism was conduct "aimed at the United States whose effects are directed at and felt here." *Id.* at 1336 (quotation omitted).

*Wultz* concerned a suicide bombing in Tel Aviv, facilitated by wire transfers carried out by the Bank of China. 755 F. Supp. 2d at 18. As the district court noted, *Wultz* "stressed the importance of *knowledge*" that a financial transaction supported terrorism. Doc. 182 at 42. But the district court distinguished *Wultz* because (1) the Bank of China's activity in the United States was more extensive, (2) its belief that QIB did not know is services supported terrorism, and (3) because *Wultz* relied on *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456 (S.D.N.Y. 2010), where the plaintiffs offered evidence that a bank sent money directly to the 9/11 bombers. Doc. 182 at 44.

Those distinctions do not hold. For starters, as noted above, QIB's activity in the United States is not relevant to the effects test; rather, jurisdiction is proper because QIB's support of terrorism was "aimed at" the United States. Schrier amply alleged that QIB knew its conduct supported terrorism. To recap once more, QIB's due diligence alerted it that al-Kabi used his account to fund the Nusra Front, yet

QIB allowed al-Kabi to use its services for that purpose for more than a year after Schrier escaped. Doc. 149 ¶¶ 208, 243–52, 254–259. Indeed, at the first motion to dismiss hearing, the district court observed that the complaint "lay[s] out the factual predicate" for "the very obvious clues that would have led anyone" to realize what was going on. Doc. 64 at 19–20. And last, the due process clause does not require Schrier to show that his injuries "correspond one-to-one with particular transfers, but instead may rest upon" transfers "to terrorist front organizations in close temporal proximity to" his injuries. *Schansman v. Sberbank of Russia PJSC*, 565 F. Supp. 3d 405, 413 (S.D.N.Y. 2021) (quotation omitted and alteration adopted); *see also Weiss*, 176 F. Supp. 3d at 280 (asserting jurisdiction where bank transfers "overlapped with the attacks … that caused Plaintiffs' injuries").

Requiring a showing that a particular dollar funded a particular attack would not just set an impossible task, it would disregard *Ford*'s rejection of a causation requirement for jurisdiction. It would also disregard the fungibility of money. A terrorist organization can put money to myriad uses; if it carries out an attack, "money from other sources could be redistributed to make up for the shortfall." *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 507 (E.D.N.Y. 2012); *Boim*, 549 F.3d at 697–98.

Besides misapplying these cases, the district court ignored Congress's findings in enacting JASTA. Entities "necessarily direct their conduct at the United

States" when they provide anti-American terrorists with "resources, directly or *indirectly*," and "should reasonably anticipate being brought to court in the United States to answer for such activities." JASTA, § 2(a)(6) (emphasis added). That finding and the national security judgment it embodies is entitled to deference. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 34–35 (2010). JASTA, coupled with QIB's knowing support of terrorism, authorized the district court to exercise jurisdiction based on the effects of QIB's conduct here.

### D. The exercise of jurisdiction under Rule 4(k)(2) will not offend traditional notions of fair play and substantial justice.

With the purposeful availment and relatedness prongs satisfied, QIB "must make a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Louis Vuitton*, 736 F.3d at 1355 (quotation omitted). In this analysis, the Court considers: "(1) the burden on the defendant, (2) the forum's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, and (4) the judicial system's interest in resolving the dispute." *Id.* at 1358 (quotation omitted).

These factors all point to the exercise of jurisdiction. QIB has shown itself perfectly able to defend the suit in Florida through its counsel. There is no indication "that jurisdiction in the forum will make litigation so gravely difficult and inconvenient that [it] unfairly [is] at a severe disadvantage in comparison to [its] opponent." *Managed Care Adv. Grp., LLC v. CIGNA Healthcare, Inc.*, 939 F.3d

1145, 1158 (11th Cir. 2019).  Congress made the United States' interest in affording

relief abundantly clear in JASTA, § 2(b):

> The purpose of this Act is to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against … entities … wherever acting and wherever they may be found, that have provided material support … to foreign organizations or persons that engage in terrorist activities against the United States.

And Schrier of course has an urgent interest in obtaining effective relief under the

ATA in U.S. courts.  Given all this, the exercise of jurisdiction would not offend

"fair play and substantial justice."

### III.    Jurisdiction is also proper because it would be neither arbitrary nor fundamentally unfair under the Fifth Amendment.

The Court should also reverse because the Fifth Amendment, unlike the

Fourteenth Amendment, should not be understood to require "minimum contacts"

for the exercise of personal jurisdiction.  Instead, it should be understood to require

merely that the exercise of jurisdiction not be "arbitrary or fundamentally unfair."

*Yousef*, 327 F.3d at 111–12.  This is the correct standard for the reasons recently set

out by dissenting Fifth Circuit judges in *Douglass v. Nippon Yusen Kabushiki

Kaisha*, 46 F.4th 226, 249–82 (5th Cir. 2022) (en banc) (Elrod, J., dissenting).

Schrier acknowledges that this Court rejected this standard in *Herederos*, 43

F.4th 1303.  But the Supreme Court has left open whether the Fifth Amendment sets

a different personal jurisdiction standard.  *See Bristol-Myers Squibb Co. v. Super.*

*Ct.*, 137 S. Ct. 1773, 1784 (2017).  And the en banc Fifth Circuit recently divided on this very question.  *Compare Douglass*, 46 F.4th at 235–36, *with id.* at 270 (Elrod, J., dissenting).  Schrier advances this argument to preserve it for certiorari review or in the event the Supreme Court sets a new standard during the pendency of this appeal.

By this standard, QIB is subject to personal jurisdiction in federal court. Congress did not act "arbitrarily" when it subjected foreign actors to suit in federal court for assisting terrorism.  Congress found that international terrorism "threatens the vital interests of the United States," and it could reasonably protect that vital interest by giving injured U.S. citizens a cause of action against the terrorists that hurt them.  Nor has QIB demonstrated any unfairness to litigating here. After all, it does business in the U.S. through its New York correspondent accounts, and it has shown itself perfectly capable of mounting a defense through able counsel.  *See Managed Care*, 939 F.3d at 1158 ("[I]t is only in highly unusual cases that inconvenience will rise to a level of constitutional concern.").  Schrier thus preserves the argument that the district court should have exercised personal jurisdiction because it would have been neither arbitrary nor fundamentally unfair under the Fifth Amendment Due Process Clause.

**IV.   The Florida Long-Arm Statute provides an alternative basis for personal jurisdiction that comports with due process.**

In the alternative, the district court had personal jurisdiction under the Florida Long-Arm Statute, Fla. Stat. § 48.193(1)(a)(2). Jurisdiction under the Florida Long-Arm Statute would be inconsistent with jurisdiction under Rule 4(k)(2) because that Rule applies only where no state court has jurisdiction. Schrier presents this alternative argument to preserve the claim to jurisdiction. If the Court determines Schrier served QIB under the ATA, it need not reach the Florida Long-Arm Statute, because the ATA subsumes contacts with Florida under the nationwide contacts analysis. If the Court determines jurisdiction exists under the Florida Long-Arm Statute, it need not reach Rule 4(k)(2). If, however, it rejects jurisdiction under the Florida Long-Arm Statute, then it should exercise jurisdiction under Rule 4(k)(2) as outlined above.

The Florida Long-Arm Statute subjects nonresidents to personal jurisdiction for "any cause of action arising from … [c]ommitting a tortious act within th[e] state." Fla. Stat. § 48.193(1)(a)(2). QIB need not have committed the tortious act itself. "Florida law construes the state's long-arm statute to reach all of the alleged participants in a civil conspiracy, at least one act of which is committed in Florida." *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F.Supp.2d 1349, 1354 (S.D. Fla. 2009); *see also eLandia*, 690 F.Supp.2d at 1330.

As noted *supra* Section II.C.ii, QIB entered a conspiracy with the Nusra Front. Without repeating all said above, QIB agreed to provide financial services to the

Nusra Front's agent, al-Kabi, knowing al-Kabi intended to and did use those services to fundraise for the Front. Those allegations establish a conspiracy. The district court claimed in passing that Schrier did not assert a claim for civil conspiracy, Doc. 182 at 23, but Schrier does assert a conspiracy claim under the ATA, Doc. 149 ¶¶ 337–345, 353–370. Based on the conspiracy, and again as discussed above, the district court could impute the Nusra Front's conversion of Schrier's accounts to QIB. And the intentional acts in Florida—the conversion of funds to purchase items from two vendors in Florida, *id.* ¶¶ 74–75—satisfied due process. *See Licciardello*, 544 F.3d at 1288.

These conversions happened in Florida. The district court disagreed, holding that money in an account is converted "where the defendant effects a withdrawal." Doc. 182 at 26 (quoting *Envases Venezolanos, S.A. v. Collazo*, 559 So.2d 651, 652–53 (Fla. 3d DCA 1990)). Some courts have so held. *See John Hall Elec. Contracting, Inc. v. Allstate Const., Inc.*, 917 So.2d 310, 311–312 (Fla. 1st DCA 2005) (citing *Envases*). But a Florida court has also held that "[s]ince conversion is a *continuous act*, if the property converted has been taken from one county to another, it may be said to have been committed in either county for purposes of venue." *Intercapital Funding Corp. v. Gisclair*, 683 S.2d 530, 532 (Fla. 4th DCA 1996) (quotation omitted) (emphasis added). In *Gisclair*, a defendant took converted accounts receivable to another county and exchanged for cash. *Id.* The court held

that the conversion was committed not just when the defendant converted the accounts receivable, but again when it obtained cash, such that venue lay in both locations. *Id.  Gisclair* supports that QIB committed conversion in Florida when it spent Schrier's misappropriated funds here.

The district court also gave the Florida Long-Arm Statute too restrictive a construction.  It held that Schrier's claims could not arise from the conversion because "the Nusra Front converted his money *after* he was kidnapped."  Doc. 182 at 28.  In other words, the district court held that the conversion did not *cause* Schrier's claims.  But under Florida law, "[t]he term arising from is broad; it does not mean proximately caused by, but only requires a direct affiliation, nexus, or substantial connection."  *Citicorp. Ins. Brokers (Marine), Ltd. v . Charman*, 635 So.2d 79, 82 (Fla. 1st DCA 1994) (quotation omitted); *cf. Caiazzo v. Am. Royal Arts Corp.*, 73 So.2d 245, 250–51 (Fla. 4th DCA 2011) (due process "imposes a more restrictive requirement than the long-arm statute's broad grant of jurisdiction").  That the Nusra Front was able to convert Schrier's funds because of his kidnapping establishes a "direct affiliation" or "nexus" between the Nusra Front's torts and his claims.  *Cf., e.g.*, *Wells Fargo Equip. Fin., Inc. v. Bacjet, LLC*, 221 So.3d 671, 676 (Fla. 4th DCA 2017) (allowing suit against out-of-state lender with loan secured by Florida property).

And for the reasons discussed *supra* Section II.D, the exercise of jurisdiction under the Florida Long-Arm Statute would not offend traditional notions of fair play and substantial justice.

## V.     The district court failed to exercise its discretion in the face of QIB's discovery misconduct.

Reversal is also warranted for the district court's failure to exercise its discretion under Federal Rule of Civil Procedure 30(d)(2) whether to sanction QIB for discovery misconduct.  At its deposition, QIB refused to answer plainly relevant questions about whether transactions in its correspondent accounts supported the Nusra Front or Ahrar al-Sham.  Doc. 158 at 28.  Then, QIB turned around and complained about the absence of such evidence in its motion to dismiss.  *See* Doc. 156-1 at 15.  The district court accepted that argument without even noting QIB's refusal to testify about it.  Doc. 182 at 36–37.  Schrier requested sanctions: that the district infer the correspondent account transactions benefitted the terrorists that held Schrier captive.  Doc. 158 at 28–29.  The district court's order did not address or mention the sanctions request.

Discovery sanctions are in the discretion of the district court.  *See Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1542 (11th Cir. 1993).  But a district court abuses its discretion if it fails to exercise that discretion.  *See Showan v. Pressdee*, 922 F.3d 1211, 1220 (11th Cir. 2019) ("Because the district court erroneously concluded it had no discretion, it necessarily abused that discretion."); *see also LSLJ*

50

*P'ship v. Frito-Lay, Inc.*, 920 F.2d 476, 479 (7th Cir. 1990) ("[T]he abuse of discretion standard implies that the judge must actually exercise his discretion."). The district court's failure to address or even mention QIB's misconduct was no exercise of discretion at all.

The district court had a basis for sanctions. QIB violated the Rules at its deposition. "Rule 30(c)(2) provides only three justifications for instructing a deponent not to answer a question: to preserve a privilege; to enforce a limitation imposed by the court; or to present a Rule 30(d)(3) motion." *Mitnor Corp. v. Club Condos.*, 339 F.R.D. 312, 319 (N.D. Fla. 2021). QIB's refusal to answer questions did not meet any of those criteria. The questions about whether transactions through its New York correspondent accounts financed Syrian terrorism were relevant to jurisdiction. QIB can hardly argue otherwise; it built its motion to dismiss around what it claimed was the lack of such evidence. *See* Doc. 156-1 at 13–16. Yet neither it nor the district court acknowledged that QIB's discovery misconduct led to the supposedly lacking evidence. The rules authorized the Court to sanction QIB in the circumstances.

Of course, QIB's silence was itself evidence. But the adverse inference would compel the conclusion that QIB was subject to jurisdiction. Schrier requested a sanction proportional the QIB's misconduct: an inference that the transactions QIB refused to testify about supported the Nusra Front and Ahrar al-Sham and financed

Schrier's captivity.  That sanction was within the district court's discretion.  The Supreme Court has upheld sanctions that result in the exercise of personal jurisdiction, as have the lower courts.  *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704 (1982); *D.J. Simmons, Inc. v. Broaddus*, No. 99-1105, 2000 WL 36729814, at *9–10 (D.N.M. June 10, 2000), *aff'd in part, rev'd in part on other grounds* 116 F. App'x 964 (10th Cir. 2004).  Inferring that QIB would have given unfavorable testimony would reasonably punish the misconduct and deter it in the future.  Whether to impose such a sanction was the district court's call to make, and it failed to do so.  This Court should remand for the district court to exercise its discretion.

## CONCLUSION

A single act can suffice for personal jurisdiction.  *Burger King*, 471 U.S. at 475 n.18.  QIB completed six transactions in its New York correspondent accounts, and it conspired with Syrian terrorist groups, and its conduct caused effects in this country.  Any one of these supply minimum contacts sufficient for personal jurisdiction.  This Court should reverse the dismissal for lack of personal jurisdiction and remand for proceedings on the merits.

Respectfully submitted this 21st day of December, 2022.

*/s/ Matthew R. Sellers*
John H. Rains IV
Georgia Bar No. 556052, Florida Bar No. 56859
Kamal Ghali
Georgia Bar No. 805055
Matthew R. Sellers
Georgia Bar No. 691202
rains@bmelaw.com
ghali@bmelaw.com
sellers@bmelaw.com
**BONDURANT, MIXSON & ELMORE, LLP**
1201 West Peachtree Street, N.W., Suite 3900
Atlanta, Georgia 30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111

*Attorneys for Plaintiff Matthew Schrier*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) because, excluding the parts of the documented exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,667 words as counted by Microsoft Office 365, the word processing software used to prepare this brief.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 635, Times New Roman, 14 point font.

<em>/s/ Matthew R. Sellers</em><br>Matthew R. Sellers<br>Georgia Bar No. 691202

## **CERTIFICATE OF SERVICE**

I hereby certify that I have filed a true and correct copy of the foregoing **APPELLANT MATTHEW SCHRIER'S OPENING BRIEF** using the CM/ECF filing system which will cause copies to be served on counsel of record.  I further certify that I served an unredacted version of this brief on counsel of record by email.

This 21st day of December, 2022.

> */s/ Matthew R. Sellers*
> Matthew R. Sellers
> Georgia Bar No. 691202